UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
NICOLETTE WILLIAMS,

                            Plaintiff,                                15-cv-1424 (PKC)

       -against-                                          MEMORANDUM
                                                                   AND ORDER

PACE UNIVERSITY,

                            Defendant.
-----------------------------------------------------------x

CASTEL, U.S.D.J.

           Nicolette Williams, formerly a graduate student in the Dyson College of Arts and Sciences at Pace University ("Pace"), brings a discrimination claim against Pace pursuant to Title VI of the Civil Rights Act of 1964.  42 U.S.C. § 2000(d).  Williams alleges that because she is African-American Pace gave her a failing grade on her Comprehensive Examination, thereby preventing her from receiving the degree of Master of Arts in Media and Communication Arts.  Pace maintains that Williams received a failing grade because one of her three essays lacked the detail required for a passing grade and that she failed to respond to some of the specific questions posed.  Each side had a full and fair opportunity to develop support for their side's case in the course of pretrial discovery.  Pace now moves for summary judgment on Williams' claim pursuant to Rule 56, Fed. R. Civ. P., on the grounds that she has failed to show a *prima facie* case of race discrimination and/or failed to show that Pace's non-discriminatory explanation for the failing grade was pretextual.  For reasons that will be explained, Pace's motion for summary judgment is granted.

BACKGROUND.

The following facts are taken from materials submitted by each side in connection with the summary judgment motion and are undisputed. Costello v. City of Burlington, 632 F.3d 41, 45 (2d Cir. 2011). All reasonable inferences are drawn in favor of the plaintiff, as the non-movant.

Nicolette Williams, an African-American woman, applied to Pace University's Master of Arts in Media and Communication Arts program (the "MCA Program") in November 2011 and was denied admission in January 2012. (Plaintiff's Response to Defendant's Local Civil Rule 56.1 Statement ("P's 56.1") ¶ 14). After her application was rejected, Williams contacted Dr. Maria Luskay, the Director of the MCA Program, to inquire why Pace did not admit her. (P's 56.1 ¶ 15). In response, Dr. Luskay personally reviewed Williams' application and decided to admit her into the MCA Program as a "provisionally-matriculated student." (P's 56.1 ¶ 16). Provisionally-matriculated students "are required to achieve a 'B' or better average for the first six credits of graduate study. Upon successful completion of this requirement, [the student's] status will be changed to that of a fully matriculated student." (Declaration of Edward Cerasia II ("Cerasia Decl."), Ex. B at 3). Williams eventually achieved the status of a fully matriculated student. (P's 56.1 ¶ 17).

The MCA Program is a two-year Master's program during which students must complete twenty credit hours of core course work and sixteen hours of elective course work, must participate in an internship, and must pass a "Comprehensive Examination." (P's 56.1 ¶¶ 4-5). By the spring of 2014, Williams had completed all of the coursework required for her Master's degree, achieving a cumulative grade point average of 3.50. (P's 56.1 ¶ 27; Cerasia Decl., Ex. B at 6). She also had successfully completed the internship requirement. (P's 56.1 ¶

27).  Williams needed only to pass the Comprehensive Examination to receive her degree.  (P's 56.1 ¶ 27).

The Comprehensive Examination consists of two or three essay questions covering at least three subject areas within the MCA Program, which students must complete within four hours.  (P's 56.1 ¶ 8).  Dr. Luskay, along with a faculty committee, select the essay questions for each student's exam.  (P's 56.1 ¶¶ 7, 9).  One of those essay questions must come from a "core course" in the MCA Program.  (P's 56.1 ¶ 8).

MCA Program professors who teach the courses that are tested on each student's Comprehensive Examination write the attendant essay questions and grade the student's answers to those questions.  (P's 56.1 ¶ 10).  Each exam question is scored on a pass/fail rubric that includes four possible grades: "pass excellent;" "pass good;" "fail fair;" and, "fail poor."  (P's 56.1 ¶ 38; Cerasia Decl., Ex. B at 22-23).  The Comprehensive Examinations are not graded anonymously.  (P's 56.1 ¶ 37).  The professors who grade each question submit their final grades and any related comments to Dr. Luskay for review.  (P's 56.1 ¶ 11).  Ultimately, Dr. Luskay decides whether a student passed or failed the exam.  (P's 56.1 ¶¶ 11-12).

The Comprehensive Examination faculty committee, composed of Dr. Michelle Pulaski Behling, Dr. Paul Ziek, and Dr. Luskay, chose three essay questions for Williams' Comprehensive Examination.  (P's 56.1 ¶¶ 31-32).  They drew those questions from Williams' Media Relations, Blogging for a Better Planet, and Industry Theory and Practice courses.  (P's 56.1 ¶ 32).  Industry Theory and Practice is a core course in the MCA Program.  (P's 56.1 ¶ 32).  The Industry Theory and Practice question was given greater weight on the exam because it was drawn from a "core course," but neither Williams nor any other student was informed of the weighting of particular questions.  (P's 56.1 ¶ 67).

Williams studied for the Comprehensive Examination for months. (P's 56.1 ¶ 34). During her preparation, Williams asked the MCA Program professors questions about the exam and stated at her deposition that those professors did not treat her differently than any other student. (P's 56.1 ¶34). Williams does claim, however, that some member of the Pace faculty told her that the focus of the Comprehensive Examination would be on spelling and grammar. (Declaration of Nicolette Williams ("Williams Decl.") ¶ 5). Williams sat for the Comprehensive Examination in May 2014 with nine other students, (P's 56.1 ¶ 35), two of whom were also African-American, (P's 56.1 ¶ 98). Williams and the other two African-American students failed their Comprehensive Examinations; the other seven students passed. (P's 56.1 ¶¶ 59, 98).

Williams performed differently on each of the three examination questions. On the Media Relations question, Professor Mark Bruce gave Williams a grade of "pass good." (P's 56.1 ¶ 40). On the Blogging for a Better Planet question, Professor Andrew Revkin gave Williams "a passing grade . . . on the cusp of a 'fail fair' grade." (P's 56.1 ¶ 43). And, on the Industry Theory and Practice question, Dr. Pulaski Behling gave Williams a "fail fair" grade. (P's 56.1 ¶ 47). After consulting with the faculty committee, Dr. Luskay gave Williams a failing grade on the Comprehensive Examination because Williams "failed the core course question for Industry Theory and Practice, which is a fundamental course for the MCA Program, as well as the fact that she barely passed the blogging question." (Declaration of Dr. Maria T. Luskay ("Luskay Decl.") ¶¶ 21-22).

The other two African-American students did not complete their entire exam. (Luskay Decl. ¶ 28). They did, however, retake the exam the next semester, passed it, and received their degrees from Pace. (Luskay Decl. ¶ 28). On the retake exam, one of the other

African-American students received a passing grade on a question written and graded by Dr. Pulaski Behling.  (P's 56.1 ¶ 101).

On May 17, 2014, Dr. Luskay informed Williams that she did not pass the Comprehensive Examination and that she should retake the exam the next semester.  (P's 56.1 ¶ 62).  Williams emailed Dr. Luskay expressing her surprise and disappointment that she had failed the exam and asking Dr. Luskay for the exam rubric and if there was a petition process that allowed her to "view [her] score and the comments [she] received from each professor."  (P's 56.1 ¶ 63; Cerasia Decl., Ex. B at 14).  She concluded her email by writing that "[t]hroughout this program, I feel that I have been held to a different grading standard in comparison to certain students but I have never allowed that to deter me."  (P's 56.1 ¶ 65; Cerasia Decl., Ex. B at 14).  Dr. Luskay responded to Williams' email by attaching the annotated exam rubric, by telling Williams that the core course question was more heavily weighted than the other questions, and by setting up a time to speak with Williams.  (P's 56.1 ¶ 66).

Thereafter, Williams emailed Professor Revkin regarding her performance on the Comprehensive Examination.  (P's 56.1 ¶ 68).  She told him that "[i]t is clear that I ran out of time but my overall presentation was decent considering the limited amount of time we had."  (P's 56.1 ¶ 69).  Professor Revkin responded to Williams and told her that her essay on the blogging question was "well written, but did not feel adequate given what the question asked for" and that "it was the overall score – largely a function of another question, not the blogging question, [he believed] – that tipped the balance."  (P's 56.1 ¶ 70).  He closed his email to Williams by writing "[b]est wishes whichever way this plays out.  A pothole, not a brick wall.  You'll shine," and offering himself as a reference for her moving forward.  (P's 56.1 ¶ 71).

Williams also emailed Dr. Ziek, a member of the Comprehensive Examination faculty committee, to express her disappointment about failing. (P's 56.1 ¶ 72). She told Dr. Ziek that "[she knew] that [she] may have missed a few technical points but [she] was expecting at least a pass-fair." (P's 56.1 ¶ 72). Dr. Ziek, like Professor Revkin, encouraged Williams by telling her to "[r]emember that whatever the problem, [she] can and will fix it." (P's 56.1 ¶ 73).

On May 19, 2014, Williams spoke with Dr. Luskay and Dr. Luskay further clarified that Williams failed the exam because her Industry Theory and Practice answer lacked the detail required for a passing grade, that she failed to answer certain aspects of that question, and that it was important for students to pass the core course question because the core courses are the foundation of the MCA Program. (P's 56.1 ¶ 74). After that meeting, Williams formally appealed her grade on that question and requested an objective review of her Comprehensive Examination from Nira Herrmann, Dean of Pace's Dyson College of Arts and Science. (P's 56.1 ¶ 77). In her email, Williams wrote: "I have the utmost respect for Dr. Luskay and I learned a great deal in the program but I have concerns about my comprehensive exam result." (P's 56.1 ¶ 77).

In accordance with Pace's appeals procedure, Professor Robert Klaeger, Chair of the Media, Communications, and Visual Arts Department, reached out to Williams and asked her to explain, in detail, why she believed Dr. Pulaski Behling did not follow the rubric in giving her a failing grade. (P's 56.1 ¶ 78). Williams explained that Dr. Pulaski Behling's grade was incorrect because Williams' answer surpassed the grading criteria listed in the "fail poor" column of the rubric. (P's 56.1 ¶¶ 79-81). However, Williams referenced the wrong grading criteria: Dr. Pulaski Behling gave Williams a "fail fair," not a "fail poor." (P's 56.1 ¶¶ 47, 80). In that same email to Professor Klaeger, Williams also admitted certain shortcomings in her

essay response. (P's 56.1 ¶¶ 82-83). She wrote that: "I acknowledge that under the category of content and development I did not perform as stalwartly as I did under the other categories within the rubric . . . ;" and, that "I failed to cite two definitions as outlined in the course." (Cerasia Decl., Ex. B at 24-25).

Professor Klaeger then requested a response from Dr. Pulaski Behling and forwarded that response to Williams. (Cerasia Decl, Ex. B at 33-40). Dr. Pulaski Behling explained that Williams' "writing was strong but too many content areas were missing . . . to pass the question. Much more content was expected in this response." (Cerasia Decl., Ex. B at 34). More specifically, Dr. Pulaski Behling wrote that:

> [T]he ideas on ethics and social media polices lacked coherency and were underdeveloped. The statements on social media policy were not supported. The policy included in the responses says that social media is important and will be used in the workplace but there is no discussion of HOW social media will be used, what types of social media will be used, what constitutes 'responsible' use of social media at work. These were issues that were discussed at length during the semester. The ethics policy was lacking in coherent ideas and was underdeveloped. All that was mentioned was dress code and anti-discrimination. More development is needed in terms of the following concepts: privacy, conflict of interest, piracy, dating at work, stealing, lying, etc.

(Cerasia Decl., Ex. B at 34-35). And, under the "Strength of Response" heading, she stated that "[m]ore than 2 points were missing. Lack of an ethics policy and social media policy. No mention on monitoring in the workplace or the specific type of communication climate." (Cerasia Decl., Ex. B at 35). Ultimately, Professor Klaeger denied Williams' appeal on the basis of Dr. Pulaski Behling's explanation, encouraged Williams to take the exam again, and wished her success in her second attempt. (Cerasia Decl., Ex. B at 33). Williams, however, never retook the Comprehensive Examination. (Williams Decl. ¶ 14). In July 2014, Williams received

a degree in the mail from Pace, but was informed by Pace in November 2014 that it was sent to her in error because she had not passed the Comprehensive Examination. (P's 56.1 ¶¶ 103, 107).

DISCUSSION.

    I.    Legal Standard:

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a), Fed. R. Civ. P. A fact is material if it "might affect the outcome of the suit under the governing law . . . ." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). It is the initial burden of a movant on a summary judgment motion to come forward with evidence on each material element of his claim or defense, demonstrating that he is entitled to relief as a matter of law. Vt. Teddy Bear Co., Inc. v. 1–800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004).

When the moving party has met this initial burden and has asserted facts demonstrating that the non-moving party's claim cannot be sustained, the opposing party "must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250. In raising a triable issue of fact, the non-movant carries only a "limited burden of production," but nevertheless "must demonstrate more than some metaphysical doubt as to the material facts, and come forward with specific facts showing that there is a genuine issue for trial." Powell v. Nat'l Bd. of Med. Exam'rs, 364 F.3d 79, 84 (2d Cir. 2004) (internal quotation marks omitted).

An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. The Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact

could find in favor of the nonmoving party." Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir. 1995) (internal quotations and citations omitted). In reviewing a motion for summary judgment, the Court must scrutinize the record, and grant or deny summary judgment as the record warrants. Rule 56(c). In the absence of any disputed material fact, summary judgment is appropriate.

II.   Title VI Claims:

"Title VI provides that '[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.'" Tolbert v. Queens Coll., 242 F.3d 58, 69 (2d Cir. 2001) (quoting 42 U.S.C. § 2000d). To establish a claim based on Title VI, the plaintiff must show "that the defendant discriminated against him on the basis of race, . . . that that discrimination was intentional, . . . and that the discrimination was a 'substantial' or 'motivating factor' for the defendant's actions." Id. (internal citations omitted).

Court's in this Circuit analyze Title VI claims under the burden-shifting framework set forth in McDonnell-Douglas Corp. v. Green, 441 U.S. 792 (1973). See, e.g., Koumantaros v. City Univ. of New York, 2007 WL 840115, at *7 (S.D.N.Y. Mar. 19, 2007); Bettis v. Safir, 2000 WL 1336055, at *1 (S.D.N.Y. Sept. 15, 2000). Accordingly, the first inquiry is "whether the plaintiff has successfully asserted a *prima facie* case of [race] discrimination against these defendants." Back v. Hastings On Hudson Union Free Sch. Dist., 365 F.3d 107, 123 (2d Cir. 2004) (alterations added). If a plaintiff makes out a *prima facie* case of discrimination, "the defendants have the burden of showing a legitimate, nondiscriminatory reason for their actions." Id. "In order to prevent summary judgment in favor of the plaintiff at this stage, that explanation must, if taken as true, '*permit* the conclusion that there was a

nondiscriminatory reason for the adverse action.'" Id. (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993)).

"A plaintiff then has the opportunity to prove 'by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" Id. (quoting Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253, (1981). To defeat summary judgment, "the plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the 'motivating' factors." Id. In any event, the plaintiff "bears the ultimate burden of persuasion, and must adduce enough evidence of discrimination so that a rational fact finder can conclude that the adverse job action was more probably than not caused by discrimination." Id.

A. Williams fails to set forth a *Prima Facie* Case of Discrimination.

Pace argues that it is entitled to summary judgment on Williams' Title VI claims because no material fact is in dispute and Williams has failed to set forth a *prima facie* case of race discrimination. Williams does not argue that there are genuine disputes of material fact, but contends instead that she has met her minimal burden of establishing a *prima facie* case of discrimination based on the record presented. The Court concludes that Williams has failed to meet her burden on this first step of the McDonnell-Douglas framework.

To meet the burden of establishing a *prima facie* case of discrimination under Title VI, a plaintiff must show, through direct or indirect evidence, that: "(1) she is a member of a protected class; (2) she suffered an adverse action in pursuit of her education by defendant; (3) she was treated differently from similarly situated students who are not members of the protected class; and (4) she was qualified to continue in her educational pursuit." Koumantaros, 2007 WL

840115, at *8 (citing Bell v. Ohio State Univ., 351 F.3d 240, 253 (6th Cir. 2003)).  At the summary judgment stage, a plaintiff's burden in establishing a *prima facie* case of discrimination "is a minimal one."  Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).

Williams easily satisfies the first and second elements of a *prima facie* case. Williams, as an African-American woman, is a member of a protected class.  See, e.g., Peters v. Molloy Coll. of Rockville Ctr., 2013 WL 5652503, at *10 (E.D.N.Y. Oct. 16, 2013).  And, she has suffered an adverse action in pursuit of her education: she received a failing grade on her Comprehensive Examination and thus was ineligible to receive her degree, (P's 56.1 ¶ 62).  See Peters, 2013 WL 5652503, at *10 (holding that plaintiff satisfied the second element of a *prima facie* case of discrimination because "she has suffered an adverse action in pursuit of her education as a result of receiving a failing grade . . . being denied graduation and conferral of a Master's Degree"); Jacques v. Adelphi Univ., 2011 WL 6709443, at *5 (E.D.N.Y. Dec. 19, 2011) (holding that plaintiff's dismissal from a nurse practitioner program "constitutes an adverse action in pursuit of her education").

As to the third element, however, Williams has failed to come forward with evidence showing that she was treated differently than other similarly situated students. Williams argues that she has met her burden on this element because the undisputed evidence shows that she and the other two African-American students that took the Comprehensive Examination in May 2014 received failing grades, that the grading was not anonymous, and that Dr. Luskay had final say over whether students passed or failed the exam.  But, Williams has not shown that any non-African-American student who completed the examination and received a passing grade performed similarly to her on the exam or was subject to different and more favorable testing conditions.

"Whether two employees are similarly situated ordinarily presents a question of fact for the jury." Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000). In this case, however, Williams has presented no evidence from which any reasonable jury could conclude that other students were similarly situated to her and were treated differently by the Pace faculty. For example, Williams does not show that Dr. Luskay passed any other student who received one "pass good," one "passing grade . . . on the cusp of a 'fail fair' grade," and a "fail fair" on the "core course" question like Williams did. (P's 56.1 ¶¶ 40, 43, 47). In fact, Williams does not offer any evidence of the content of any other students' exam answers or the individual grades any other student received.

The closest Williams gets to offering evidence of differential treatment is her statement that "a non-African-American woman (Turkish) who had difficulty writing in English, and who [Williams] helped prepare for the exam, passed the exam," (Williams Decl. ¶ 8), and her belief that, in a separate course, Professor Bruce, who gave Williams a passing grade on one of her Comprehensive Examination questions, graded a white student more easily than Williams, (Cerasia Decl., Ex. A at 79-81). Williams has had a full and fair opportunity to conduct discovery. Nothing further will be known at trial that is not knowable at this juncture. Williams' vague and conclusory statements about the work of other students and the manner in which their work was graded does not meet her minimal burden of establishing differential treatment. The fact that two other African-American students also failed the May 2014 Comprehensive Examination does not create an inference of discrimination either because their factual situations are too dissimilar. Specifically, neither of those students actually completed their examinations and both later retook their exams, passed them, and received their degrees. (P's 56.1 ¶ 98). No

reasonable jury could conclude that Pace gave passing grades to similarly situated non-African-American students.

Nor does Williams show that any of the other students who took the May 2014 Comprehensive Examination did so under more favorable conditions. Each of the ten students took the Comprehensive Examination set up by the same faculty committee; each exam included two or three essay questions; each exam had one question from a "core course;" each exam was four hours long; each exam was graded on the same pass/fail rubric; and, no exam was graded anonymously. (P's 56.1 ¶¶ 7-10; 37-38). Each student's exam was different in some respects, i.e. the content of the questions, but Williams has not put forward evidence that would permit a reasonable jury to conclude that other students' examinations were easier than her exam. Williams also claims that a Pace faculty member told her that the Comprehensive Examination focused on spelling and grammar, but she does not show that other students were told anything different. (Williams Decl. ¶ 5). And, while Williams states that she was not notified that one question would be weighed more heavily than others, (Williams Decl. ¶ 9), Dr. Luskay stated that no student received any advanced notice of that fact and Williams does not dispute Dr. Luskay's statement. (P's 56.1 ¶ 67). None of the facts emphasized by Williams, even when viewed in the light most favorable to her, provide a basis on which a reasonable trier of fact could conclude that Pace treated Williams differently than other similarly situated students.

Because Williams cannot establish the third element, Williams has failed to set forth a *prima facie* case of race discrimination and the Court need not decide whether she is objectively qualified to continue in her education. See Koumantaros, 2007 WL 840115, at *8, n12.

B. Pace Shows Non-Discriminatory Reasons for Failing Williams.

Even if Williams had established a *prima facie* case of discrimination, Pace has set forth legitimate, non-discriminatory reasons for Williams' failing grade on the Comprehensive Examination.

"When judges are asked to review the substance of a genuinely academic decision . . . they should show great respect for the faculty's professional judgment." <u>Regents of Univ. of Michigan v. Ewing</u>, 474 U.S. 214, 225 (1985).  According to Dr. Luskay, Williams received a failing grade because she "failed the core course question for Industry Theory and Practice, which is a fundamental course for the MCA Program, as well as the fact that she barely passed the blogging question." (Luskay Decl. ¶ 22).  Regarding Williams' answer to the blogging question, Professor Revkin told Williams that her essay was "well written, but did not feel adequate given what the question asked for" and that "it was the overall score – largely a function of another question, not the blogging question, [he believed] – that tipped the balance." (P's 56.1 ¶ 70).  On the Industry Theory and Practice question, Dr. Pulaski Behling explained to Williams that her "writing was strong but too many content areas were missing . . . to pass the question.  Much more content was expected in this response." (Cerasia Decl., Ex. B at 34). More specifically, Dr. Pulaski Behling wrote that:

> [T]he ideas on ethics and social media polices lacked coherency and were underdeveloped.  The statements on social media policy were not supported.  The policy included in the responses says that social media is important and will be used in the workplace but there is no discussion of HOW social media will be used, what types of social media will be used, what constitutes 'responsible' use of social media at work.  These were issues that were discussed at length during the semester.  The ethics policy was lacking in coherent ideas and was underdeveloped.  All that was mentioned was dress code and anti-discrimination.  More development is needed in terms of the following concepts: privacy, conflict of interest, piracy, dating at work, stealing, lying, etc.

(Cerasia Decl., Ex. B at 34-35).

In addition, a separate Pace faculty member, Dr. Klaeger, undertook a review of Williams' Industry Theory and Practice answer and found Dr. Pulaski Behling's rubric score and comments to support a grade of "fail fair." (Cerasia Decl., Ex. B at 33). Even Williams herself admitted to Dr. Klaeger that "under the category of content and development [she] did not perform as stalwartly as [she] did under the other categories within the rubric . . . ;" and, that "[she] failed to cite two definitions as outlined in the course." (Cerasia Decl., Ex. B at 24-25). She also told Dr. Ziek that "[she knew] that [she] may have missed a few technical points but [she] was expecting at least a pass-fair." (P's 56.1 ¶ 72). Pace's explanation for why Williams received a failing grade on her Industry Theory and Practice answer and on her Comprehensive Examination overall shows that there were legitimate, nondiscriminatory reasons for Williams' grade.

C.  Williams Provides No Evidence of Discriminatory Pretext.

With Pace having established non-discriminatory reasons for giving Williams a failing grade, the burden would fall to Williams "to show that the employer's proffered reasons . . . were not the only reasons and that the [race] was at least one of the 'motivating' factors." Id. She has, however, failed to adduce any evidence creating an inference of discrimination on the part of Pace or any Pace faculty member. Williams merely "proffers [her] own belief that she was discriminated against," which is insufficient to defeat a motion for summary judgment. McKinney v. NXP Semiconductors USA, Inc., 2009 WL 3029537, at *10 (S.D.N.Y. Sept. 22, 2009).

Williams asserts that she was discriminated against when Pace decided to issue her a failing grade on the Comprehensive Examination and prevented her from receiving her Master's degree. (Williams Decl. ¶ 15). She bases that conclusion on her belief that:

> I answered a total of three questions. And I did well on one question; I did, I think, decently on another question; and then another question I just completely failed based on the fact that [Dr. Pulaski Behling] said I didn't adhere to the details or things like that. I wanted to see a grading rubric where she gave me points, you know, like say five points here, ten points there, and to see a total of points to equal my grade. I didn't see that. So I felt she made up the reason why she failed me.

(Cerasia Decl., Ex. A at 165-66). She even wrote to Dr. Luskay that "[t]hroughout this program, I feel that I have been held to a different grading standard in comparison to certain students but I have never allowed that to deter me." (P's 56.1 ¶ 65; Cerasia Decl., Ex. B at 14). However, the record in this action contains no evidence of discrimination or racial animus. Instead, it contains the opposite: evidence that Pace and the particular faculty members implicated in this action were supportive of and professional with Williams during her time in the MCA Program.

For example, Dr. Luskay personally reviewed Williams' application and decided to admit her into the MCA Program as a "provisionally-matriculated student," even after Williams had been rejected by the Program. (P's 56.1 ¶¶ 15-16). Her role in admitting Williams precludes the inference that Dr. Luskay later discriminated against Williams on the basis of her race. See Figueroa v. New York Health & Hosps. Corp., 500 F. Supp. 2d 224, 236 (S.D.N.Y. 2007) (quoting Watt v. New York Botanical Garden, 2000 WL 193626, at *7 (S.D.N.Y. Feb. 16, 2000)) ("The 'underlying rationale for the [same-actor] inference is simple: it is suspect to claim that the same manager who hired a person in the protected class would suddenly develop an aversion to members of that class.'"). Moreover, Williams testified at her deposition that Dr. Luskay never did or said anything that was derogatory about Williams' race and that their

interactions were always "professional."  (Cerasia Decl., Ex. A at 17-18).  In her letter seeking an appeal of her Comprehensive Examination grade, Williams herself wrote: "I have the utmost respect for Dr. Luskay and I learned a great deal in the program but I have concerns about my comprehensive exam result."  (P's 56.1 ¶ 77).

Dr. Pulaski Behling, the professor who gave Williams a "fail fair" on her answer to the Industry Theory and Practice exam question, had given Williams two A-'s in other courses she taught, including the Industry Theory and Practice course, which also was not graded anonymously.  (P's 56.1 ¶¶ 18, 21-22).  In addition, in the Current Issues in Media Technology course, Dr. Pulaski Behling gave Williams advice on how she could improve her grade in that course, which Williams stated made her feel "more confident about preparing for the final."  (P's 56.1 ¶ 24).  At her deposition, Williams testified that she and Dr. Pulaski Behling had a "good relationship," although she stated that she believed she "wasn't graded fairly with certain things that [she] had done, certain papers that [she] had written."  (P's 56.1 ¶ 26; Cerasia Decl., Ex. A at 28-30).  And, on a retake of the Comprehensive Examination, one of the two African-American students who failed the May 2014 exam alongside Williams received a passing grade on an Industry Theory and Practice question written and graded by Dr. Pulaski Behling.  (P's 56.1 ¶ 101).  The fact that Dr. Pulaski Behling gave Williams two A-'s in other courses and passed one of the other African-American students on his retake of the Comprehensive Examination precludes the inference that Dr. Pulaski Behling failed Williams because she was African-American.

Finally, Dr. Ziek, a member of the Comprehensive Examination faculty committee, and Professor Revkin, who graded Williams' blogging answer, both encouraged Williams to persevere after Williams told them she had failed her exam, with Professor Revkin

going so far as to offer himself as a reference for her moving forward. (P's 56.1 ¶¶ 71, 73). Williams stated at her deposition that she had a "good relationship" with Professor Revkin and Dr. Ziek and the neither of them ever did or said anything to Williams that she believed was discriminatory. (P's 56.1 ¶¶ 44, 46, 58). Williams also stated the same about Professor Bruce, (P's 56.1 ¶ 42), even though she claims that he graded a white student more easily than her on another occasion, (Cerasia Decl., Ex. A at 79-81).

        Williams relies on Jacques v. Adelphi Univ., 2011 WL 6709443, at *5, a case in which Judge Wexler concluded that "[d]espite Defendants' explanation as to their conduct, which a jury could certainly accept, the court holds that a rational jury could also ultimately find that Plaintiff was subject to unlawful discrimination" when she was dismissed from Adelphi's Nurse Practioner Program and denied Adelphi's motion for summary judgment on that basis. Id. In Jacques, however, unlike here, there was evidence in the record that created a reasonable inference of discrimination. Id. For example, there were affidavits from the plaintiff's classmates that described a segregated classroom where the professor lectured mostly to the side of the classroom where the white students sat and that recalled the professor giving correct examination answers only to non-African-American students. Id. at *4. Here, Williams has failed to produce any evidence from which a reasonable jury could fund that Dr. Luskay, Dr. Pulaski Behling, or any other Pace faculty member discriminated against Williams by giving her a failing grade on the Comprehensive Examination. Williams failing grade and Dr. Luskay's broad discretion to pass or fail students, is not sufficient to permit Williams' Title VI claims to survive a motion for summary judgment.

CONCLUSION.

Pace University's motion for summary judgment is GRANTED. (Dkt. 22). The Clerk is directed to enter final judgment for the defendant and close the case.

SO ORDERED.

_____
P. Kevin Castel
United States District Judge

Dated: New York, New York
       June 16, 2016